PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 07-4750

ANTWONNE D. WHITE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
John T. Copenhaver, Jr., District Judge.
(2:06-cr-00163)

Argued: October 31, 2008

Decided: December 12, 2008

Before WILKINSON and GREGORY, Circuit Judges,
and Martin K. REIDINGER, United States District Judge
for the Western District of North Carolina,
sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Gregory and Judge Reidinger joined.

## COUNSEL

**ARGUED:** Harry Robert Reinhart, Columbus, Ohio, for
Appellant. Monica Lynn Dillon, OFFICE OF THE UNITED

STATES ATTORNEY, Charleston, West Virginia, for Appellee. **ON BRIEF:** Charles T. Miller, United States Attorney, Charleston, West Virginia, for Appellee.

---

## OPINION

WILKINSON, Circuit Judge:

Antwonne White appeals the district court's denial of his motion to suppress evidence seized during his June 29, 2006, arrest. Police seized approximately 89.5 grams of cocaine powder from White's vehicle during the arrest. White was subsequently charged with one count of conspiracy to distribute cocaine and cocaine base and one count of possession of cocaine powder with intent to distribute. After entering a conditional plea of guilty to the second count, White received a sentence of 20 years imprisonment.

We affirm the district court's conclusion that the officers had probable cause to search White's car. As its name suggests, probable cause involves probabilities – judgment calls that are tethered to context and rooted in common sense. Here, as the Supreme Court has noted, police can corroborate an informant's tip when that tip is borne out by actual events. *See Draper v. United States*, 358 U.S. 307 (1959). We find no fault with the district court's conclusion that the officers had reason initially to find their informant credible – a credibility that was only buttressed when events played out as the informant had forecast.

I.

A.

On June 29, 2006, Yusuf Ali arrived in Charleston, West Virginia, and checked into a Motel 6. Several hours later,

Charleston police arrested him for possession of crack cocaine. Although Ali initially lied to the officers about his circumstances, he later agreed to cooperate with them in hopes of reducing his punishment. When questioned by the officers, Ali provided the names of several drug dealers known to him in Charleston. One dealer, whom Ali called "Skip," was recognized by the officers as Antwonne White, whose car they had stopped several months earlier and searched for drugs unsuccessfully. At the officers' request, Ali agreed to call White and set up a drug deal for later that day.

As the officers watched, Ali called someone to obtain White's cell phone number and then called White several times. White answered Ali's third call and quickly hung up, refusing to discuss any deals over the phone. Ali called again and told White that he had "66" for some "stuff," intending to communicate that he had $6,600 for cocaine. White agreed to meet Ali at the Family Dollar store in Charleston, and Ali told the officers that he had arranged with White to buy nine ounces of cocaine from him there. Although Ali had seen White drive three different vehicles in the past several months, he told the officers that White likely would be driving a blue Mustang convertible.

Ali called White while under arrest in the police station, and the officers observed and listened to Ali as he talked to White. The officers did not record the numbers Ali dialed, however, or listen to White's side of the conversation. Although the officers placed a recording device in Ali's phone to record the calls, they later discovered – while preparing for White's prosecution — that the device had malfunctioned and was blank.

After Ali set up the deal, police sent unmarked cars to watch the Family Dollar and nearby streets. After circling the store several times, officers saw a blue Mustang convertible stop briefly in the Family Dollar parking lot. They then

watched the Mustang travel to a house at 1406 Stuart Street, about a block away. They identified White when he got out of the Mustang, walked into the residence, and returned to the car about five minutes later.

Around this time, Ali reported that White had called him and requested to move the deal because the area around the Family Dollar was "too hot." Ali took this to mean that police activity made it unsafe to deal there. According to Ali, White had redirected the deal to the "Food" Pharmacy off of Oakwood Road, which the officers interpreted to mean the Fruth Pharmacy in Charleston. White then drove in the direction of the Fruth Pharmacy.

When White reached an area known as Five Corners in Charleston, officers stopped his vehicle with a marked cruiser. When asked, White told the officers that there were no weapons in the Mustang and that he did not have any crack cocaine. He also denied the officers permission to search the vehicle. One officer then started the vehicle's engine and closed the top of the convertible part way in preparation for the arrival of a drug-sniffing dog. At 8:30 pm, a dog performed a drug sniff of the Mustang and showed interest, but did not alert. The lieutenant supervising the investigation then called in a second drug-sniffing dog, which alerted near the driver's door of the Mustang. Officers then searched the vehicle and found a plastic bag in the trunk containing about 89.5 grams of cocaine powder.

## B.

A grand jury indicted White on one count of conspiracy to distribute cocaine and cocaine base from February 2001 to June 2006 in violation of 21 U.S.C. § 846, and one count of possession of cocaine powder with intent to distribute on June 29, 2006, in violation of 21 U.S.C. § 841(a)(1). On August 22, 2006, White moved to suppress the evidence of cocaine seized from the Mustang. Over the next several weeks, White

filed several supplemental memoranda in support of his motion. On October 23, 2006, the district court held a hearing on the motion, where it listened to testimony from Ali and from four police officers. The court then issued an order denying White's motion to suppress. The court held that the officers "were justified" in finding Ali's information reliable, and that they further had probable cause to believe that White was transporting drugs when he arrived at the Family Dollar. In the alternative, the court held that the officers had sufficient reasonable suspicion to conduct a *Terry* stop and that the length of White's detention was reasonable.

On December 10, 2006, White filed a motion for reconsideration based on an alleged inconsistency between White and Ali's phone records and testimony regarding the phone calls between them. The district court held a second hearing on January 22, 2007, and subsequently denied White's motion for reconsideration.

White entered a conditional guilty plea to count two of his indictment, charging possession of cocaine with intent to distribute. The district court held a two-day sentencing hearing where it calculated an advisory guidelines range of 324 to 405 months. Because in the court's view the statutory maximum for White's offense was 20 years, the court found that the suggested guidelines sentence was the statutory maximum, and sentenced White to imprisonment for 20 years.

White filed a timely appeal, challenging the denial of his motion to suppress and his sentence.

## II.

White claims that the district court erred in denying his motion to suppress because the officers had no basis for believing that Ali was truthful or that his tip was reliable. *See Illinois v. Gates*, 462 U.S. 213, 233 (1983). Therefore, the officers lacked probable cause to search his vehicle, and the

evidence uncovered in that search should be excluded under the Fourth and Fourteenth Amendments. *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

## A.

We must first review the applicable principles of law. It is well established that officers who have probable cause can search a vehicle without a warrant. *Carroll v. United States*, 267 U.S. 132 (1925). This exception lacks a separate exigency requirement – rather, "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam); *see also United States v. Ross*, 456 U.S. 798, 809 (1982). In crafting this exception, the Court noted that vehicles can move quickly out of reach, and that effective police work will often require seizing contraband before a warrant can be obtained. *Carroll*, 267 U.S. at 151-53. And when police have probable cause to search a vehicle, "nice distinctions" among different parts of the car such as the glove compartment and trunk "give way to the interest in the prompt and efficient completion of the task at hand." *Ross*, 456 U.S. at 821. In other words, officers may conduct a thorough search of the vehicle once probable cause is established. *Id.* at 800.

To determine whether officers have probable cause to conduct a search, courts rely on the totality of the circumstances test established in *Illinois v. Gates*, 462 U.S. 213 (1983). In *Gates*, the Court replaced the prior two-prong test of whether (1) the informant was truthful, and (2) the information was reliable, with a more flexible, commonsense approach. *See id.* at 230-39; *see also Aguilar v. Texas*, 378 U.S. 108 (1964); *Spinelli v. United States*, 393 U.S. 410 (1969). The Court noted that the *Aguilar-Spinelli* test was at odds with traditional approaches to probable cause, which rested on commonsense judgments of laymen and resisted neat

categorization. *See Gates*, 462 U.S. at 235-36 (noting that warrants were often issued by people other than lawyers and judges). Moreover, the two-prong test had spawned "'apparently ceaseless litigation'" as courts attempted to devise legal rules to govern its application. *Gates*, 462 U.S. at 238, n.11 (quoting 8A Moore's Federal Practice ¶ 41.04 (1982)). Finally, the Court worried that a rigid judicial test would hamper legitimate police work, and noted that tips from informants are critical in solving crimes and protecting the public. *Id.* at 237-38. In sum, the Court concluded that probable cause determinations involve diverse factual scenarios that are "not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232.

*Gates* thus directs courts to assess whether officers had probable cause by examining all of the facts known to officers leading up to the arrest, and then asking "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer," amount to probable cause. *Ornelas v. United States*, 517 U.S. 690, 696 (1996). An informant's truthfulness and reliability, while certainly relevant, are only two factors among many that courts may consider. A very detailed tip, for example, may compensate for questions about the informant's reliability, and a tip that relies on hearsay may be deemed reliable if police later can corroborate it. *See Gates*, 462 U.S. at 234, 241-42.

The Supreme Court's decision in *Draper v. United States*, 358 U.S. 307 (1959) remains "the classic case on the value of corroborative efforts" by police. *Gates*, 462 U.S. at 242. In *Draper*, a paid informant told a federal narcotics agent that a man carrying illegal narcotics would arrive on a train from Chicago on September 8 or 9, wearing a light-colored raincoat and carrying a tan bag, and that the suspect typically walked quickly. *Draper*, 358 U.S. at 309. Officers observed the train arriving from Chicago on September 8, but saw no one fitting this description. On September 9, police again observed the station and saw a man alight from the Chicago train "wearing

the precise clothing described by [the informant]," carrying a tan bag and walking quickly toward the exit. *Id.* at 309-10. Police arrested and searched him. When the defendant moved to exclude the drugs found in that search, the Court held that the officer had probable cause to search after corroborating most of the informant's tip through personal observation. *Id.* at 312-13.

Similarly, we held in *United States v. Miller*, 925 F.2d 695, 697 (4th Cir. 1991), that police had sufficiently corroborated a tip from an unknown informant when they observed a woman arrive by bus in Winston-Salem wearing blue jeans and a blouse and carrying a brown tote bag, just as the informant had described. The court noted that, under *Draper*, police may establish probable cause even if they "conduct[ ] no investigation beyond observing the predictions supplied by an informant's tip." *Miller*, 925 F.2d at 699. To require a specific type of corroboration such as an independent investigation would violate the flexibility emphasized in *Gates*. *Id.* Rather, observation of "a substantial portion of what the informant's tip had said they would see," may constitute sufficient corroboration. *Id.* at 698-99.

Finally, we note the deference we owe in probable cause determinations to district court findings of fact. In *Ornelas v. United States*, 517 U.S. 690, 699 (1996), the Court held that courts of appeals should review probable cause determinations *de novo*, but "hasten[ed] to point out that a reviewing court should . . . review findings of historical fact only for clear error and . . . give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." This deference is appropriate for at least two reasons. First, district judges can better assess facts "in light of the distinctive features and events of the community" in which they serve. *Id.* The Court noted that such "background facts, though rarely the subject of explicit findings, inform the judge's assessment of the historical facts" – in *Ornelas*, for example, the fact that Lake Michigan blocks further eastward

progress from Milwaukee and that few tourists visit the city in winter made it reasonable to credit the officers' assessment that a motel visitor from California was not there to see the local sights. *Id.* at 699-700.

Similarly, deference is appropriate because only district judges have the chance to assess the demeanor and testimony of those persons actually involved with the search. In this regard, the district court is entitled to respect the inferences drawn by officers from their "own experience in deciding whether probable cause exists." *Id.* at 700. In *Ornelas*, the officer noticed a loose panel beneath the car's armrest, which led him to believe that drugs might be hidden there. The Court noted that a layman might see nothing suspicious about a loose panel, but an officer with years of experience might see telltale signs of contraband. *Id.* Therefore, a reviewing court "should give due weight to a trial court's finding that the officer was credible and the inference was reasonable." *Id.*

Thus, in considering the denial of a motion to suppress, we must be mindful of a trial court's superior vantage point. Because the district court denied White's motion, we construe the evidence in the light most favorable to the government. *See United States v. Uzenski*, 434 F.3d 690, 704 (4th Cir. 2006).

B.

Applying these principles to White's case, we must uphold the district court's conclusion that the officers had probable cause. To begin with, the court's consideration was a conscientious one. It held two hearings – one on White's motion to suppress, and the other on his motion to reconsider. At the first hearing, the court heard testimony from Ali and from four police officers involved in setting up the deal and making the arrest. The court credited Ali's testimony that an offer to pay "66" for "stuff" was an offer to pay $6,600 for cocaine, noting Ali's specific knowledge and experience with the drug

culture. The court also listened to the officers testify about their familiarity with Charleston and their reasons for inferring that White was heading to the Fruth Pharmacy when he left Stuart Street.

Next, when White filed his motion to reconsider, the court held a second hearing where both parties presented evidence on the cell phone records of White, Ali, and Charleston Police Officer Derrick McDaniel. The court examined these records in detail and concluded that Ali received a call that could have come from White at 8:00 p.m., and that White tried to call Ali three times between 7:57 p.m. and 8:08 p.m., the last call coming 14 minutes before White's arrest. The court found no reason, based on this evidence, for doubting Ali's testimony that White had called him to redirect the deal to the Fruth Pharmacy.

Finally, when White claimed that Ali had confessed to a prison inmate that he planted the drugs in White's car, the court brought that inmate to the courtroom on the day of the second hearing. Nevertheless, White chose not to call him as a witness. It is clear here that the district court considered all of the information before it and gave White every opportunity to present his version of the facts. The court listened to White's speculation about many of the events, speculation that he raised again on appeal: for instance, that Ali was lying to curry favor with the officers; that Ali or the officers caused the recording device to malfunction; or that White meant to sell his car – rather than drugs – to Ali in the Family Dollar parking lot. The district court found no basis for crediting any of these claims, and we should think long and hard before we toss careful trial court conclusions out the window.

Second, we find ample basis in the record for the district court's conclusion that the officers could have found Ali credible and therefore had probable cause to arrest White. We note at the outset that Ali had been arrested on a possessory offense and had every incentive to cooperate with the police.

He hoped to lessen his punishment, and risked additional charges if he gave the officers false information. *See Miller*, 925 F.2d at 699 (finding that "[t]he informant's interest in obtaining leniency created a strong motive to supply accurate information."). Ali spoke with the officers face to face and in close quarters, where they could easily assess his credibility.

Although the officers decided to target White as "[t]he most prominent of the names given by [Ali]," *United States v. White*, No. 2:06-cr-00163, slip. op. at 1 (S.D.W.Va. Nov. 1, 2006), it was Ali who first mentioned White's name. *See Miller*, 925 F.2d at 697 (concluding that officers could have found an informant's tip reliable where the informant provided the name of a known drug dealer to police). Ali's phone conversations with White took place while Ali was at the police station, in the presence of officers and under close observation. Finally, and importantly, the district court found that both Ali and the officers believed his phone calls were being recorded. Ali would have been playing a dangerous game indeed by lying to the officers in such circumstances.

And then, of course, every bit of information that Ali provided was quickly borne out by actual events. First, Ali told officers that White would arrive at the Family Dollar in a blue Mustang convertible to conduct the deal. The officers set up surveillance at the Family Dollar, and a short time later White arrived there driving a blue Mustang. After White left the Family Dollar for a nearby residence, Ali reported that White wanted to move the transaction to the "Food" Pharmacy off Oakwood Road. Officers then watched White drive in the direction of the Fruth Pharmacy off of Oakwood. In fact, the district court took judicial notice of the fact that White's route from Stuart Street to Five Corners, where he was arrested, "was the most direct route to Fruth Pharmacy." *United States v. White*, No. 2:06-cr-00163, slip op. at 5 (S.D.W.Va. Nov. 1, 2006).

At this point, Ali had pinpointed two locations where White would appear and had described the exact car that White would be driving. As in *Draper*, the officers "had personally verified every facet of the information given [them] by [the informant] except whether petitioner [was transporting drugs]." *Draper*, 358 U.S. at 313. It is common sense that when an informant provides information that is consistently borne out by a suspect's own actions, officers are hardly required to look the other way. Moreover, as the Supreme Court has noted, failing to act in the face of such information could render an officer derelict in his duties. *See id.* Considering these circumstances in their totality, as we must, we find that the officers had probable cause to search White's car and that the district court did not err by denying White's motion to suppress. We therefore affirm the district court's ruling.*

The judgment is accordingly affirmed.

*AFFIRMED*

---

*Because we agree with the district court's ruling on probable cause, we do not reach questions on the alternative ground of reasonable suspicion and the length of White's detention.

We also find no merit in the various assignments of error raised by the defendant regarding his sentence – namely, that he was wrongly classified as a career offender, that he was wrongly denied a reduction for acceptance of responsibility, and that his base offense level was wrongly enhanced by two levels for obstruction of justice. For its part, the government has raised no objection to the sentence imposed. *See Greenlaw v. United States*, 128 S. Ct. 2559 (2008) (holding that courts of appeals should not increase a defendant's sentence absent a cross-appeal by the government). We thus affirm the sentence.