**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-4191**

UNITED STATES OF AMERICA,

                    Plaintiff - Appellee,

          v.

ALEJANDRO FLORES,

                    Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville.   Lacy H. Thornburg, District Judge.  (1:08-cr-00073-LHT-1)

Argued:  January 29, 2010                Decided:  March 5, 2010

Before TRAXLER, Chief Judge, NIEMEYER, Circuit Judge, and Jackson L. KISER, Senior United States District Judge for the Western District of Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Andrew Brady Banzhoff, Asheville, North Carolina, for Appellant.  Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:** Edward R. Ryan, Acting United States Attorney, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Alejandro Flores ("Flores") pled guilty to possession with intent to distribute at least five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1) and received a sentence of seventy months of imprisonment and three years of supervised release. Flores's guilty plea was conditional pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure and reserved his right to appeal the district court's denial of his motion to suppress all evidence seized from the search of his vehicle and trailer. On appeal, Flores argues that the trial court should have granted his motion because the stop of his vehicle and ensuing search violated the Fourth Amendment. For the reasons that follow, we conclude that the search and seizure of Flores's vehicle and trailer was consistent with Constitutional mandates. Specifically, we find that the entire search was within the scope of Flores's consent and that the troopers had probable cause to conduct the search even absent consent. Accordingly, we affirm.

## I. Facts

On June 10, 2008, at approximately 11:00 a.m., North Carolina State Highway Patrol Trooper Ray Herndon ("Trooper Herndon" or "Herndon") was on stationary patrol on Interstate 40 in Haywood County, North Carolina. He observed Flores's white

2

Ford Bronco traveling east, and as the vehicle approached Trooper Herndon, Flores braked sharply, causing his vehicle to travel to the right of the white fog line and nearly collide with the bridge rail.[1] As the Bronco passed Herndon at approximately sixty miles per hour, the trooper observed Flores "sitting very fixed and rigid" in his seat and tightly grasping the steering wheel. Although Herndon acknowledged that everyone is nervous during a traffic stop, he described Flores's reaction to seeing him as "extreme." The trooper pursued Flores and observed the Bronco travel across the fog line once more, traverse back into its lane, and then cross the dotted center line. After following Flores for approximately two miles, Herndon initiated a vehicle stop at 11:05 a.m.

Approaching the vehicle on the passenger side, the trooper noticed "greasy smudges all over the white rims" of the two-wheel trailer affixed to the Bronco. He also observed that the lug nuts appeared to have been worn to the point they were very shiny, as if they had been taken off and put on numerous times. The flat bed trailer contained only a spare tire, and the tailgate was wired shut. Although the Bronco displayed a Colorado license plate, the trailer had an Arizona registration plate.

---

[1] The bridge railing at that section of the highway was approximately one and a half to two feet from the fog line.

In the cabin, Trooper Herndon observed Flores sitting in the driver's seat, an adult female sitting in the passenger seat, and a juvenile female with a dog seated in the back. Herndon asked for Flores's license and registration, at which point he observed that Flores's hands were shaking so dramatically that he repeatedly fumbled in his attempts to retrieve his driver's license from his wallet. Flores was breathing out of his mouth as if out of breath, and the whole side of his neck was visibly pounding with a rapid pulse. The adult female passenger opened the glove box to search for the vehicle's registration, and Trooper Herndon noticed her hands were also visibly shaking, and she appeared to have a rapid pulse as well. The trooper was alarmed by this behavior, particularly the extent of nervousness of the female passenger, because such passengers are not typically nervous during traffic stops. Sensing something was not right, Herndon asked Flores to join him at the rear of the vehicle. After obtaining consent, the trooper patted Flores down for weapons and noted Flores's heart was racing "as if he had been exercising heavily."

Trooper Herndon advised Flores he had stopped him because he was "all over the road," and the two had a brief conversation in English about Flores's lane violations. Afterward, the trooper asked Flores to sit in the front passenger seat of his patrol car while he checked Flores's license and registration.

4

Although there was no problem with Flores's license or the registration on the Bronco, the Arizona trailer was not registered under Flores's name or the name provided by Flores.[2] Trooper Herndon notified Flores he would only receive a warning for his lane violations, but Flores continued to exhibit a "[h]eightened state of nervousness," thereby further arousing the trooper's suspicions.

After Herndon returned Flores's license and registration and issued him a copy of the warning, the trooper asked Flores if he could ask him some questions before he left. Flores agreed, and Herndon posed some general inquiries about where Flores was going and why, to which Flores replied they were traveling to somewhere in North Carolina to move the female passenger's uncle's belongings to Colorado. Flores could not identify the destination city in North Carolina or the uncle's name. He did, however, indicate they would be moving all of the uncle's belongings, including sofas, couches, and tables, despite the trooper's opinion that the five foot by twelve foot trailer could not reasonably accommodate that many items.

Increasingly suspicious, Herndon asked Flores if he could speak with the adult female passenger, whom Flores identified as

---

[2] Before Trooper Herndon checked the registration, Flores identified an individual named "Juan" as the owner of the trailer. Trooper Herndon's check revealed it was actually registered to "a Pablo something."

"Marilena or Marilyn," his girlfriend of "five, six, seven years." Flores agreed, and the trooper proceeded to the Bronco, where the female passenger identified herself as Nereyda Mendez ("Mendez").[3] Mendez confirmed that she was Flores's girlfriend and that they were traveling to a location in North Carolina to pick up furniture to move to Colorado. Mendez identified the owner of the furniture as her cousin, though, and when asked for his or her name, Mendez responded with a blank stare. Eventually, Mendez articulated they were traveling to Lumberton, North Carolina, but she was not able to produce a name for the cousin. Throughout the conversation, Trooper Herndon continued to notice "a quick, rapid pounding pulse" in Mendez's neck, which the trooper found abnormal.

Herndon returned to his patrol car to discuss the inconsistencies between Flores's and Mendez's stories. Ultimately, the trooper explained to Flores that he suspected them of possessing illegal contraband, and he requested permission to search Flores's vehicle. Flores consented, both orally and in writing.[4] Flores inquired whether the trooper would damage the vehicle in the search, and Herndon said he

_____

[3] "Marilyn or Marilena" turned out to be the name of the young girl seated in the back of the Bronco.

[4] Trooper Herndon used a printed "consent to search" form that included Flores's information, the vehicle information, and the trailer information. The Trooper did not read the form to Flores or advise him of any rights in relation to the form.

would not, but "if [he] did damage it accidentally or something, . . . [the Highway Patrol] would take care of the damage." Herndon then requested assistance, and Trooper Michael Hicks ("Trooper Hicks") arrived shortly thereafter to aid in the search.

During the search, Flores remained in Herndon's patrol car. Trooper Hicks stood by the patrol car door with Mendez, the juvenile child, and the dog. No one was handcuffed. Trooper Herndon started by searching the Bronco. Despite the parties' explanation about traveling across the country, Trooper Herndon found no luggage. The trooper then proceeded to examine the trailer. Herndon noticed that the lug nuts on the driver's side were shiny, just as on the passenger side, and there were greasy smudges on the rims, just like on the other side. The floor of the trailer was "very thin" and had no reinforcement, and the axles "appeared to be extremely large" for such a small, lightweight trailer. Herndon laid on the ground to examine the axles further, and he observed several locations with new bolts and greasy handprints. Trooper Herndon's examination convinced him the shackles had been removed many times, and the axles "obviously . . . had been apart." This further increased Herndon's suspicions, as trailer axles do not typically require much maintenance. Because of his training and experience in drug interdiction, the trooper was aware that axles are a common

place to conceal contraband due to their being hollow. Based on this information--as well as the parties' nervousness and their vague and conflicting stories--he "became quite confident that the axles likely contained some kind of illegal contraband."

Trooper Herndon determined he could not conduct further inspection of the axles at the roadside, so he asked Mendez if she would be willing to travel with the troopers to the next exit so they could continue searching for contraband. Herndon then asked Mendez to assist him in explaining to Flores in Spanish what Herndon wanted to do. Although Flores had spoken "perfect English" that day, Herndon believed the conversation was becoming more complex, and he wanted to make "double sure" Flores understood. After Mendez finished explaining the situation, Flores consented to the additional search. Flores then drove the Bronco to a Pilot truck stop service bay at the next exit. Herndon asked Trooper Hicks to accompany Flores, Mendez, and the juvenile child to the Pilot store and to the restroom if they wished while Herndon examined the axles. According to Herndon, Flores, Mendez, and the child were free to move about.

Upon closer inspection, Trooper Herndon confirmed the presence of the greasy handprints, shiny bolts, new shackle bolts, and other evidence the axles had been tampered with and removed. He determined the quickest, least intrusive, and most

8

efficient way to investigate would be to drill a small hole in the axle, as that would not damage its functionality. Using a 5/16 inch drill bit, Herndon drilled a hole into the axle approximately one foot from the right side. Although the axle should have been hollow, the trooper encountered another sleeve inside the axle. According to Trooper Herndon, this sort of inner sleeve is often used by smugglers to facilitate ease of insertion and removal of contraband inside an axle. Upon drilling into the inner sleeve, the trooper noticed a white, powdery substance on the end of his drill, and he immediately smelled cocaine. A field test revealed the substance was indeed cocaine. When Flores and Mendez returned from the Pilot store, Herndon arrested them. Further inspection of the axle revealed eighteen bundles of cocaine, which weighed out to a total of approximately nine kilograms.

After a suppression hearing, the district court denied Flores's motion to suppress evidence obtained as a result of the search and seizure of Flores and his vehicle. Judge Thornburg first determined that Trooper Herndon's initial stop of Flores was proper because there was probable cause to believe Flores violated North Carolina traffic law. By state statute, law enforcement personnel may issue warning tickets for conduct that may potentially cause harm to the public. Since Trooper Herndon observed Flores cross the fog line twice and center line once,

9

the stop was proper. Second, Judge Thornburg ruled that the "numerous conversations between Trooper Herndon and Flores established" that Flores's consent was knowingly and voluntarily given, including the consent to move the Bronco to a second location for further searching. The Judge found Flores could readily understand and respond to the trooper's questions and pose his own, and Trooper Herndon did not employ a menacing or intimidating tone. Judge Thornburg further determined that the trooper's failure to notify Flores of his right to refuse consent did not vitiate the voluntariness of his consent. Third, the district court held that drilling a hole in Flores's axle did not exceed the scope of consent. Given Trooper Herndon's explicit questions about drugs, the Judge concluded a reasonable person would have understood that the trooper was asking for consent to search the entire vehicle and trailer for contraband. Although Flores inquired about damage to the vehicle, he did not object when the trooper mentioned the possibility the Highway Patrol might have to repair some damage, so he did not limit his consent. Furthermore, drilling a small hole was a reasonable method of conducting the search, as the likely alternative would have required the troopers to prolong the search by completely dismantling the axle. Finally, Judge Thornburg determined Trooper Herndon, based on his training and

experience, had probable cause to search the axle and employed the least intrusive method of doing so.

## II. Analysis

In reviewing a trial court's denial of a motion to suppress, this Court reviews factual findings for clear error and legal determinations *de novo*.  Ornelas v. United States, 517 U.S. 690, 699 (1996); United States v. Mowatt, 513 F.3d 395, 399 (4th Cir. 2008); United States v. Hamlin, 319 F.3d 666, 671 (4th Cir. 2003).

## A. Legality of the Stop

Flores argues the district court erred in determining that Trooper Herndon's initial stop was consistent with the Fourth Amendment.  Flores acknowledges the traffic offense of "Failing to Maintain a Lane," codified as follows: "A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."  N.C. Gen. Stat. § 20-146(d)(1) (2008).  Flores asserts, however, that crossing the fog line twice and the center line once does not amount to a violation of section 146(d)(1).  In support of his argument, Flores relies on United States v. Gregory, 79 F.3d 973 (10th Cir. 1996), a case in which the Tenth Circuit examined a

11

similar Utah statute and concluded that weaving into the emergency lane once was not a traffic violation providing probable cause for search and seizure. Therefore, according to Flores, Trooper Herndon lacked probable cause to make the initial stop. Alternatively, Flores asserts that no North Carolina appellate case has concluded that crossing the fog line constitutes a violation of section 146(d)(1).

The Government responds that Flores's swerving off the road amounted to a violation of section 20-146(d)(1). Based on State v. Baublitz, 172 N.C. App. 801, 616 S.E.2d 615 (N.C. Ct. App. 2005), and United States v. Gallardo-Gonzales, No. 08-4284, 2009 WL 1426907 (4th Cir. May 22, 2009), the Government argues that a stop based on a "readily observable" traffic violation is supported by probable cause. Alternatively, even if crossing the fog and center lines was not sufficient to provide probable cause, the Government asserts that the trooper's subjective belief that criminal activity might have been afoot, based on the totality of the circumstances known to the trooper, rendered the stop reasonable.

It is well-established that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 809-10 (1996). In other words, "'[w]hen an officer observes a traffic offense--however minor--he has

12

probable cause to stop the driver of the vehicle.'" United States v. Hassan-El, 5 F.3d 726, 730 (4th Cir. 1993) (quoting United States v. Cummins, 920 F.2d 498, 500 (8th Cir. 1990)). Additionally, pursuant to state and federal precedent, when a North Carolina patrol trooper observes a driver swerving out of his or her lane, the trooper has probable cause for a stop. See Gallardo-Gonzales, 2009 WL 1426907, at *1 (holding that Gallardo-Gonzales's "readily observable" violation of section 20-146(d) provided the officer with probable cause to effectuate a stop); Baublitz, 172 N.C. App. at 807, 616 S.E.2d at 619 (concluding that the investigator's two observations of Baublitz crossing the center line of a highway in violation of section 20-146(a) supplied probable cause for the stop).

Based on the precedent, there can be little doubt the district court was correct in ruling Trooper Herndon had probable cause to stop Flores. When Flores first noticed the trooper, his Bronco suddenly swerved right of the fog line and nearly collided with the bridge railing. The trooper pursued Flores and observed two additional instances of his inability to maintain a single lane. Although Flores appears to be correct that no North Carolina state appellate court has addressed whether this sort of conduct constitutes a violation of the statute, at least one unpublished case from this Court has concluded, with little difficulty, that a single incident of

13

crossing over the fog line is a violation of that section. See Gallardo-Gonzales, 2009 WL 1426907, at *1. Moreover, the absence of state precedent on the matter may simply be due to the fact that the language found in section 20-146(d)(1) is so clear that there can be little doubt that swerving in and out of a lane constitutes a violation of the statute unless additional circumstances make maintenance of a single lane impractical. See § 20-146(d)(1). In any event, Flores's three readily observable traffic infractions permitted Trooper Herndon to effectuate a stop consistent with the Fourth Amendment. See Whren, 517 U.S. 816; Gallardo-Gonzales, 2009 WL 1426907, at *1; Baublitz, 172 N.C. App. at 807, 616 S.E.2d at 619; see also N.C. Gen. Stat. § 20-183(b) (2008) (authorizing law enforcement to issue warning tickets for conduct that could harm the public).

Flores's reliance on the Tenth Circuit's opinion in United States v. Gregory is misplaced. Although the Utah statute in Gregory is similar to section 20-146(d),[5] the facts presented are substantially different. In ruling that the officer did not have probable cause to stop Gregory, the Tenth Circuit emphasized that Gregory's single lane crossing was likely due to the winding road, mountainous terrain, and windy conditions.

---

[5] In Gregory, the court interpreted Utah Code section 41-6-69(1), which provides that "[a] vehicle shall be operated as nearly as practical entirely within a single lane and may not be moved from the lane until the operator has determined the movement can be made safely." Gregory, 79 F.3d at 976 n.2.

14

*Gregory*, 79 F.3d at 978. The court noted that the Utah statute only requires a vehicle to remain in a single lane "as nearly as practical" and concluded that, "*[u]nder these conditions*[,] any vehicle could be subject to an isolated incident of moving into the right shoulder of the roadway[] without giving rise to a suspicion of criminal activity." Id. (emphasis added). Unlike in *Gregory*, the present case presents no indication that weather or road conditions made it impractical for Flores to maintain a single lane. Moreover, unlike *Gregory*, Trooper Herndon observed Flores swerve out of his lane three times, not just once. *Gregory* is therefore distinguishable from the present facts, and nothing on the record indicates the district court erred in fact or law in holding that probable cause supported the initial stop.

### B. Consent to Search and Seize

Flores next argues that Trooper Herndon did not have valid consent to search the vehicle and trailer. First, Flores maintains that Herndon should have let Flores go after returning Flores's license and registration and issuing him a ticket, as Flores's nervousness was not sufficient to create a reasonable suspicion of additional criminal activity.[6] Second, Flores

---

[6] According to Flores, "[t]he Trooper later acknowledged that the defendant's status as an illegal alien might have

15

asserts that the language employed by Trooper Herndon to ask Flores if he could pose additional questions was "coercive and confusing" and conditioned Flores's freedom to leave on his willingness to answer questions.[7] According to Flores, this rendered Flores's continued detention involuntary and vitiated his consent. Third, Flores argues that "the physical appearance of the officer, including his all black para-military style outfit[] and his physically imposing size provided an inherently coercive atmosphere . . . ."[8] When coupled with the fact that Trooper Herndon did not advise Flores of his rights or ability to refuse consent, this further rendered Flores's consent

accounted for his nervousness." This reading of the testimony is patently incorrect. The portion of the record cited by Flores reads as follows:

> Q. Would you agree, wouldn't you, that if he was in this country illegally, that certainly would account for that nervousness[?]
> A. You want my opinion? Is that what you're asking?
> Q. Well, I mean—
> A. I don't necessarily agree with your broad statement there, no.
> Q. If he is an illegal alien, that certainly would make him nervous in the presence of a law enforcement officer, wouldn't [it]?
> A. Well, that would depend on the illegal alien. Everybody is different.

[7] Trooper Herndon testified that he wrote in his report: "I asked Mr. Flores if I could ask him some questions before he left."

[8] Flores's Brief details Trooper Herndon's clothing, height, and weight on the date in question. The description appears to match that of a normal highway patrol officer and does not present anything even arguably out of the ordinary.

16

involuntary. Flores argues he would not have subjected himself to the "embarrassment and humiliation" of traveling by police escort to the truck station but for his belief he was not free to decline.

The Government counters that the evidence reveals Flores knowingly and voluntarily consented to the searches of his vehicle, including both the initial search and the later search at the truck station. Relying on several Fourth Circuit cases, the Government argues Herndon's return of Flores's driver's license and registration was a crucial moment separating the compulsory portion of the stop from the voluntary portion. According to the Government, once Herndon returned Flores's driver's license and registration and issued a warning, the trooper's language and conduct would have led a reasonable person to believe any further questioning was voluntary. Under these circumstances, Flores's explicit, verbal consent to additional questioning prevents the conclusion that the continued inquiry violated the Fourth Amendment. The Government notes, based on Fourth Circuit precedent, that advising Flores of his right to refuse consent was not a prerequisite to it being voluntary. The Government further asserts that Flores's statements and conduct--including the fact that Flores helped the troopers move the Bronco and trailer to the truck station with knowledge of Trooper Herndon's specific suspicions--provide

17

ample proof of his consent to the later search. Finally, the Government points out that the district court found no evidence of coercion. Therefore, based on the totality of the circumstances, the Government maintains that the lower court's decision should be upheld.

Even where an initial stop is justified by probable cause, after satisfying the purpose for which the stop was made and issuing a citation or warning, the officer must permit the driver to proceed on his way without further delay, and any continued detention for questioning is illegal absent a reasonable suspicion of a serious crime. United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004); United States v. Rusher, 966 F.2d 868, 876-77 (4th Cir. 1992). In circumstances where the individual would be free to go but voluntarily stays and engages in a dialogue with the officer, however, the questioning is considered consensual and does not trigger Fourth Amendment scrutiny. United States v. Meikle, 407 F.3d 670, 672-73 (4th Cir. 2005). This exception applies where "a reasonable person would have felt free to decline the officer's request or otherwise terminate the encounter." Id. at 672. Likewise, although a warrantless search conducted without consent is *per se* unreasonable, voluntary consent to search is an exception to that general rule. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). In examining whether consent was freely and voluntarily

18

given, the court must consider the totality of the circumstances surrounding the consent, including the age, maturity, education, intelligence, and experience of the defendant, as well as the conditions under which the consent was given. United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996). The question of voluntariness of consent is a factual question, and the district court's conclusion should be upheld unless the finding is clearly erroneous. Id. Where the lower court "bases a finding of consent on the oral testimony at a suppression hearing, the clearly erroneous standard is particularly strong since the [court] had the opportunity to observe the demeanor of the witnesses." Id. at 650-51 (internal quotation omitted).

In this case, the district court's determination that Flores voluntarily consented to Trooper Herndon's continued questioning is not clearly in error. In fact, this case presents an almost identical set of facts to those in Meikle. In Meikle, as here, an officer stopped the defendant for crossing the fog line and became suspicious about drugs due to the defendant's "extreme nervousness," which continued even after the officer notified the defendant he would only receive a warning. 407 F.3d at 671. After returning the defendant's license and registration and issuing the warning, the officer "asked [the defendant] if he could talk to him again," and the defendant replied "yes." Id. We there concluded that, having

19

reacquired his license and registration and received the warning, a "reasonable person would have felt free to decline [the officer's] request to speak" further, despite the officer's failure to explicitly say that the defendant was free to go or that he could refuse consent. Id. at 673. In the present case, the district court found that Trooper Herndon posed his request for further questioning in a manner similar to the officer in Meikle, and Flores replied with an affirmative "yes." As in Meikle, the trooper's language, coupled with the surrounding circumstances, would inform a reasonable person that he or she could refuse consent. Nothing in the record indicates that the trooper used a menacing or intimidating tone, and Flores's description of Herndon's physical appearance does not seem out of the ordinary in any respect. At the time Herndon requested the opportunity for additional questioning, the trooper had already returned Flores's license and registration, so Herndon was not withholding or restricting Flores's means of going about his business. See United States v. Weaver, 282 F.3d 302, 310-11 (4th Cir. 2002) (describing the significance of returning a defendant's license and registration). Although Herndon did not notify Flores of his right to refuse consent, "the Government need not demonstrate that the defendant knew of his right to refuse consent to prove that the consent was voluntary."

Lattimore, 87 F.3d at 650.[9]  Based on all of these factors, the district court did not err in finding Flores voluntarily consented to the questioning.

Nor can it be said the district court erred in concluding Flores consented to the initial search of his vehicle and the later search at the truck station.  Contrary to Flores's argument that Trooper Herndon employed confusing language to elicit consent, it appears the trooper went to considerable lengths to ensure Flores understood exactly what the officer was asking.  Prior to requesting permission to search, Herndon specifically inquired whether Flores was carrying illegal drugs "such as marijuana, cocaine, methamphetamine, [or] heroin" in his vehicle.  The trooper then explained that he suspected Flores of engaging in criminal activity and requested permission to search Flores's vehicle for contraband.  Only after this did Flores provide consent--both verbally and in writing--to the search.  Even if Flores's English reading skills were limited in

---

[9]  The Supreme Court elaborated on this point in Ohio v. Robinette, 519 U.S. 33 (1996):

> "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent . . . .  [S]o too would it be unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary."

Id. at 39-40.

21

some degree, as Flores argued before the district court, he was able to converse in perfect English with Trooper Herndon throughout their numerous conversations. He demonstrated his ability to understand the trooper's questions and respond appropriately. By asking whether Herndon would damage his vehicle in the search, he further established he was able to pose questions of his own. At the very least, Flores's verbal consent to the initial search was free, voluntary, and knowingly provided, and nothing in the record or testimony indicates Flores was confused about what the trooper was asking.

Moreover, when Herndon concluded he could not properly search the vehicle on the side of the highway, he employed Mendez's Spanish-speaking skills "to make double sure that [Flores] understood" what the trooper was asking. Flores unequivocally responded that "that was fine," and the troopers could do "whatever [they] needed to do." To further evince his consent, Flores then proceeded to drive his Bronco and trailer to the truck stop, park it in the service bay, and exit the vehicle so the trooper could continue his search. Based on all of these circumstances, as established at the suppression hearing through Trooper Herndon's testimony, the district court did not commit clear error in finding Flores consented to both searches.

C. Scope of Consent and Probable Cause to Search

In his third assignment of error, Flores argues that he limited his consent by requesting that the troopers not damage his vehicle. Because of this, Flores asserts that Herndon could only have drilled into his axle if they had probable cause, which Flores maintains they lacked. According to Flores, although Trooper Herndon testified at length about the axles not appearing to be "factory axles," that created nothing more than an inarticulable hunch insufficient to form probable cause. Relying on case law from other Circuits, Flores argues that, although the axles could be capable of holding contraband, the troopers did not have any additional specific facts indicating a fair probability that drugs would be found therein, thereby depriving them of probable cause.

The Government responds with three justifications supporting the district court's conclusion that the troopers did not exceed the scope of Flores's consent. First, the Government argues that Flores did not *limit* the scope of his consent; he simply *inquired* whether the troopers would damage his vehicle in the search. When Trooper Herndon responded that the Highway Patrol would take care of any damage that occurred, Flores did not object, thereby demonstrating his satisfaction with the trooper's answer. Second, the government maintains that, in driving his Bronco and trailer to a truck stop mechanic's bay,

23

Flores understood the troopers would be looking for drugs in hidden areas, including the axles. By going along with this, Flores's conduct bolsters the conclusion that the search of the axles was within the scope of his consent. Third, even if Flores limited the scope of his consent by inquiring about damage, the Government asserts that drilling the axles did not exceed the limitation, as the small drill hole did not impair the functionality of the axles in any way.

Where a defendant argues that law enforcement officers exceeded his or her consent, "[t]he standard for measuring the scope of . . . consent under the Fourth Amendment is that of 'objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251 (1991) (citing Illinois v. Rodriguez, 497 U.S. 177, 183-89 (1990), Florida v. Royer, 460 U.S. 491, 501-02 (1983), and id. at 514 (Blackmun, J., dissenting)); see also United States v. Neely, 564 F.3d 346, 350 (4th Cir. 2009). In this case, the district court correctly concluded that a reasonable person in Flores's position would have understood he was consenting to a search of the trailer's axles. Flores inquired whether the search would cause any damage to his vehicle, and Trooper Herndon notified him of that possibility. Only after that notice did Flores execute the written consent to search form, thereby consenting

with full awareness that the troopers might look within the axles. Additionally, when Trooper Herndon asked for additional consent to move the vehicle to the Pilot station, he explicitly stated the reason he wished to do so: he wanted to conduct a "closer inspection of the trailer axles because [he] suspected they contained some kind of contraband." At the point Flores again consented, he was conscious to both the possibility of damage and the trooper's interest in the contents of the axles. In other words, based on the trooper's numerous explanations, at the time Flores consented to the continued search, a reasonable person would have known what the search would entail.

In addition, the district court did not err in finding that Trooper Herndon, based on his training and experience, had probable cause to search the axle. If an officer has probable cause to believe a suspect is engaged in criminal activity, the officer may search the suspect's vehicle even absent consent or a warrant. United States v. White, 549 F.3d 946, 949 (4th Cir. 2008). Probable cause exists where "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). In evaluating whether the officer had probable cause, courts examine the totality of the circumstances. White, 549 F.3d at 949.

Although there does not appear to be any Fourth Circuit precedent with analogous facts, case law from other jurisdictions lends support for the district court's finding of probable cause. For instance, in United States v. Martel-Martines, the Eighth Circuit found that officers had probable cause to search a suspect's vehicle by punching a hole in the suspect's truck bed based on the suspect's evasive and inconsistent responses to questions, the fact that the suspect's vehicle's underside had been modified, and the existence of an inaccessible hidden compartment in the suspect's truck. 988 F.2d 855, 858-59 (8th Cir. 1993). Likewise, in United States v. Arango, the Tenth Circuit held that the existence of a secreted compartment in the defendant's truck, coupled with the fact that the defendant did not have adequate luggage for his reported two-week vacation, supplied probable cause. 912 F.2d 441, 447 (10th Cir. 1990). In United States v. Price, where burn marks on the bed of a truck drew the attention of officers, who then discovered a secret compartment within the bed, the Fifth Circuit determined the officers had probable cause to search the compartment itself. 869 F.2d 801, 804 (5th Cir. 1989). Although customization of an automobile, standing alone, is likely insufficient to support probable cause, see United States v. Orrengo-Fernandez, 78 F.3d 1497, 1504-05 (10th Cir. 1996), Martel-Martines, Arango, and Price indicate that the existence

26

of a hidden compartment is much more substantial, especially when coupled with other factors, see Martel-Martines, 988 F.2d at 858-59; Arango, 912 F.2d at 447; Price, 869 F.2d at 804.

Additionally, circumstances indicating that an auto part is meant to conceal contraband can provide added support to an officer's belief in the existence of probable cause. In United States v. Strickland, an officer noticed an uncharacteristically large, incongruently worn tire in the defendant's trunk. 902 F.2d 937, 939, 943 (11th Cir. 1990). The tire was made by a different manufacturer than the other tires on the vehicle, had a bent rim, and was extremely heavy. Id. at 943. When the officer moved the tire, he noticed a flopping sound within. Id. These factors, coupled with the officer's specialized knowledge based on training and experience in drug concealment methods, convinced the Eleventh Circuit that the officer had probable cause to cut the tire open and search inside. Id.; see also United States v. Davis, 458 F.2d 819, 822 (D.C. Cir. 1972) ("[C]onduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer." (internal quotation omitted)).

In this case, Trooper Herndon noticed the axles on the small, lightweight, two-wheel trailer were extremely large, especially considering the fact that the trailer bed was not reinforced to carry great weights. Upon examining the axles, he

27

and Trooper Hicks reached the conclusion--based on the numerous greasy smudges and handprints, the shiny, worn-down bolts, and other signs of removal--that the axles had been taken off and put on numerous times, even though such axles usually require little maintenance. Because of his eleven years of Highway Patrol and drug interdiction experience, Trooper Herndon was aware that vehicle axles are a common place for smugglers to hide drugs due to the fact that they are just hollow tubes, and the unusual size of these axles indicated they contained contraband. Moreover, both Flores and Mendez exhibited signs of extreme nervousness beyond that normally shown by traffic offenders in routine stops. The nervousness was not alleviated when the Trooper notified Flores he would only receive a warning. Flores and Mendez offered differing accounts of where they were going and what they were doing. In fact, Flores could not identify Mendez's name, despite claiming she was his longtime girlfriend, and neither Mendez nor Flores could provide the name of the cousin or uncle they were out to help. According to Trooper Herndon, the trailer affixed to Flores's Bronco was clearly insufficient to move all the property Flores alleged they would transport, and, despite Flores and Mendez's story that they were traveling across the country, the troopers found no luggage consistent with such a voyage. Based on the totality of the circumstances, the district court was correct in

28

concluding that Trooper Herndon had a fair probability of discovering contraband in Flores's trailer axles, and the search was permissible under the Fourth Amendment.

Finally, Flores's argument that the search was not within the scope of the Fourth Amendment's automobile exception due to the fact that the vehicle was not "readily mobile" after Flores exited is without merit. Numerous cases clarify that the ready mobility requirement is meant to distinguish a movable vehicle--which can easily be relocated to prevent a search for contraband--from something that would more appropriately be described as a stationary home. See, e.g., California v. Carney, 471 U.S. 386, 392-93 (1985); United States v. Brookins, 345 F.3d 231, 237 n.7 (4th Cir. 2003). In other words, the ready mobility element centers on "the nature of the *use* of the vehicle" and is more appropriate for consideration where the thing searched was being used as a house or exhibited the characteristics of a fixed dwelling rather than a functioning vehicle. Brookins, 345 F.3d at 237 n.7; see also Carney, 471 U.S. at 392-93. Since Trooper Herndon observed Flores's Bronco traveling on a public highway immediately prior to the search, this case satisfies the ready mobility requirement, and Flores's objection is unavailing. See Carney, 471 U.S. at 392-93.

29

## III. Conclusion

For the above-stated reasons, we affirm the judgment of the district court.

AFFIRMED